Filed 12/13/13  P. v. Rios CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUAN CARLOS RIOS,<br><br>Defendant and Appellant. | C070777<br><br>(Super. Ct. No. 10F03778) |

The fingerprints found on a note given to a bank teller by a heavily disguised individual that demanded the teller give him "all the money, I have a bomb" matched those of defendant Juan Carlos Rios.  An information charged defendant with robbery. (Pen. Code, § 211.)[1]  A jury found defendant guilty and the trial court sentenced him to 15 years in state prison.  On appeal, defendant argues the trial court abused its discretion

_____

[1]  All further references are to the Penal Code unless otherwise designated.

1

in denying his request to pay expert witness fees and committed clerical error. We shall order a correction of the abstract of judgment; in all other respects, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2010 a bank teller gave a man in disguise approximately $2,600. Following a fingerprint match, an information charged defendant with robbery and alleged that he had previously been convicted of robbery. (§ 211.) The information also alleged that the prior conviction brought defendant within the provisions of sections 667, subdivisions (b) through (i) and 1170.12. A jury trial followed.

Robert Schlalos worked as a teller for Chase Bank. One afternoon in June 2010 a customer wearing a sweatshirt, hat, and sunglasses approached Schlalos's window. The customer wore a "black mop-type thing" on his head, which appeared to be a wig. Schlalos identified the disguised customer from still images captured on video footage from the bank.

The customer said he had a check to cash and began checking his pockets. He pulled out a cell phone, then put it back in his pocket. The customer then pulled out a note and passed it to Schlalos. Schlalos slid the note to his manager, Danielle Stubbs, who was working to his right. The customer did not wear gloves.

The handwritten note stated: "Give me all the money, I have a bomb." After receiving the note, Schlalos opened his money drawer and began gathering between $2,600 and $2,700. As Schlalos stacked up the money, the customer grabbed it and ran out of the bank.

Schlalos did not notice any tattoos or scars on the robber. Schlalos described the robber as an average size white or Hispanic male between five feet ten inches and six feet tall, with a mustache and goatee. In addition, Schlalos described the individual's age as between his late 20's and early to mid-30's. Although defendant fit this description, Schlalos could not make a positive identification.

2

The other bank employees saw the robber, and their descriptions matched Schlalos's. Employees testified the robber wore a sweatshirt, hat, and sunglasses. He had close cropped, dark hair and appeared to be wearing a wig that looked like women's hair extensions. The robber did not wear gloves. All of the employees stated defendant resembled the robber, but they could not positively identify defendant as the robber.

A forensic investigator testified regarding fingerprint comparisons. Immediately following the robbery, the investigator went to the bank and processed prints found at the scene. Two prints taken from the bank door did not match any prints in the state database. The investigator recovered three latent prints from the paper the robber had given Schlalos.

A second forensic investigator compared the prints found on the paper with the fingerprint records from the state database. The investigator concluded the prints on the paper matched defendant's fingerprints.

The match led to defendant's arrest. At the time of his arrest, defendant appeared Hispanic, in his mid-20's, six feet tall, and to weigh 180 pounds. Defendant had no tattoos or scars on his neck or face. When he was arrested, defendant had about $600 and was wearing a very expensive pair of Air Jordan tennis shoes. Defendant's 2004 convictions for robbery and assault were entered into evidence.

**Defense Case**

Defendant's nephew testified he picked up defendant from defendant's girlfriend's house on the day of the robbery between 4:00 p.m. and 4:15 p.m. The robbery took place at approximately 4:10 p.m.

Defendant's girlfriend, Franca Moreno, testified that on the day of the robbery defendant was at her house from 10:00 a.m. until 8:00 p.m. Moreno's mother testified that defendant was with her daughter all day the day of the robbery.

Defendant testified in his own behalf. In 2004 he assaulted a man and took his necklace; he was convicted of assault and robbery. At the time of the robbery in this case, he was on parole.

Defendant testified that on the day of the robbery he was with Moreno all day. That afternoon, defendant's father called and told defendant his car had been stolen. Later that day, his father called back and said it had been found. Late that night defendant and his father recovered the car, which had been vandalized. Defendant's sweatshirt and backpack were missing from the trunk.

The day before his arrest defendant won $300 playing poker at a casino. His father had given him $260 that week, and his sister had given him $200.[2]

Defendant testified he had never been to the bank in question. He did not know how his fingerprints had gotten on the paper but thought the paper might have been in his backpack, which was in the stolen car. Defendant explained that he told officers he was home the day of the robbery, not at his girlfriend's house, because that was the first thing that came into his mind.

Defendant's father testified that his car was stolen on the day of the robbery. The car was reported stolen at approximately 4:30 that day. Officers located the car late that evening.

The jury found defendant guilty of robbery and found the prior conviction allegation true. The court sentenced defendant to a determinate term of 15 years in state prison: the upper term of five years, doubled, plus a five-year enhancement under section 667, subdivision (a). Defendant filed a timely notice of appeal.

---

[2] A police detective testified that in an interview after his arrest, defendant never mentioned winning any money at a casino before the robbery. Instead, defendant said his sister and some of his neighbors gave him the money. Nor did defendant mention being with Moreno at the time the robbery took place.

## DISCUSSION

### Expert Witness Fees

Defendant argues the court erred in denying his request to pay the expert witness fees of his handwriting expert. According to defendant, the court's refusal violated his constitutional right to due process and denied him effective assistance of counsel.

### Background

Prior to the start of evidence, defense counsel discussed one of the defense witnesses, Larry Stewart. Defense counsel described Stewart as "a handwriting expert who has provided a report indicating he has reviewed past writings of the defendant, and reviewed the bank note used in this case, and it's his opinion that the defendant did not write the words or the characters that are on the bank note." Defense counsel later stated the witness would need to be flown in from Southern California.

At the close of the prosecution's case, the trial court asked if the defense would take longer than one day. Defense counsel responded: "I say I hope to, just because of me not getting my handwriting expert here, which isn't looking good at this point, because he seems to be refusing to come since the county will not cover his travel time. [¶] The last I spoke to him on our lunch break, he said he's not -- he's going to refuse to come unless he's going to be compensated for each hour he's gonna be away from his practice, and the panel is absolutely refusing to do that at this point, and they are the ones that foot that bill since I'm appointed on this case. [¶] So without him, I think my case would conclude or come very close to it tomorrow. I still think it could easily go a full day."

After the court asked if anything else needed to be covered, defense counsel stated: "I've never had to ask, but is this -- I know there's a way I've approached Courts in the past [ex parte] to appoint an expert, I've done that, I think just on several occasion[s] pursuant to Evidence Code 736, this is a little bit different. [¶] Is there any way that I can slip the expense in the bill that the panel will not pay for the expert?"

5

The court responded: "The Court doesn't have the facilities or the monies available to enterally [*sic*] appointing experts. [¶] The Court is concerned over the defense's ability to present their case, yet I do not think that the Court is going to go and say, hey, the Court is going to pay for handwriting expert's time away from his duties to come up from southern California . . . . [¶] . . . [¶] But the Court is not going to step forward, commit court funds to pay for that."

During the defense case, defense counsel again broached the subject of the handwriting expert: "[T]he Court is well aware he had a handwriting expert. I'm not talking from my perspective, but Mr. Rios was relying on a handwriting expert as part of his defense. That expert because of money issues on an appointed case of county wouldn't pay him his travel time. [¶] It came up the last minute when we were in trial. Mr. Rios is upset about that. I don't think at me, but under the circumstance, because if this is a private case, this wouldn't be an issue, but because after $1,500 experts -- the handwriting expert we hired refuses to come to court, and now this type of material is exacerbated now since we don't have a handwriting expert to at least give his opinion that the writing, for instance, Mr. Rios in the past are not the writing, so that they don't match the writing of the bank note, and this type of material is, it just seems is a great disadvantage, especially in light of that. [¶] And I can also say when we are done, my office contacted, I think, three or four handwriting experts yesterday because I was trying to -- desperately to get someone else to look at these materials, and they all said they are going to need at least a week and a half or two weeks to evaluate everything and be prepared to come to court if their opinion was worthy of coming to court for the defense. [¶] And after Mr. Rios testifies based on everything that's happened and based on Mr. Rios' request, I would ask the Court to for a good cause continuance for a week and a half to two weeks to try to get that in, because I think he has a right to, you know, every acceptable piece of information, every acceptable defense possible, and Mr. Rios wanted that to be part of his defense."

6

The court replied: "The Court is not inclined to delay the matter. The Court's thinking is handwriting is one of those areas where if the defendant chooses to say it, he can say it. [¶] You've already said he's taking the stand. If he chooses to go and say this is not my handwriting, this is my handwriting, here's samples of my handwriting, the jurors can look at handwriting. [¶] This is [not an] area that the law says has to have an expert, and under that scenario, it wouldn't be one that the Court would say we're going to delay the trial now to get the expert."

**Discussion**

Evidence Code section 730 authorizes the trial court to appoint an expert to render advice and to testify as a witness. In addition, Evidence Code section 731 and Government Code former section 29603 state that the county must pay for those court-ordered expenses. The right to effective assistance of counsel entitles indigent defendants to access to public funds for expert services. (*Ake v. Oklahoma* (1985) 470 U.S. 68, 76-85 [84 L.Ed.2d 53] (*Ake*); *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307 (*Corenevsky*).)

However, it is only *necessary* services to which an indigent defendant is entitled, and the burden rests on the defendant to show that the expert's services are necessary to his or her defense. (*People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1304 (*Gaglione*).) Although during the give-and-take of trial preparation it may be difficult for counsel to demonstrate an undoubted need for expert services, counsel must " 'at least advise the court as to the general lines of inquiry he wishes to pursue, being as specific as possible.' " (*Puett v. Superior Court* (1979) 96 Cal.App.3d 936, 939; see *Corenevsky*, *supra*, 36 Cal.3d at p. 320.)

The decision on the need for the appointment of an expert lies within the trial court's discretion. We will not set aside the trial court's ruling absent an abuse of that discretion. (*Gaglione*, *supra*, 26 Cal.App.4th at p. 1304.)

7

Here, the trial court and defense counsel discussed the issue of a handwriting expert several times. At first, defense counsel informed the court of the existence of a handwriting expert who had reviewed the handwriting on the note and formed the opinion defendant did not write the note. Subsequently, defense counsel told the court the expert was refusing to testify unless compensated, and asked the court if there was "any way that I can slip the expense in the bill." The court expressed concern over defendant's ability to present his case but declined to commit court funds to pay for the expert.

A few days later, defense counsel discussed the expert again, not from defense counsel's perspective, but from that of his client. According to defense counsel, defendant was relying on the handwriting expert as part of his defense in an effort to prove he did not write the note given to the bank teller. Defense counsel requested a continuance in order to approach other handwriting experts. The court declined the request for a continuance, pointing out defendant could testify himself about the handwriting.

Defendant bears the burden of showing the handwriting expert's testimony was necessary to his defense; however, defense counsel failed to make such a showing, either to the trial court or on appeal. Instead, defense counsel merely stated a handwriting expert had formed an opinion that the handwriting on the note was not that of defendant. Defense counsel provided no details about either the expert or the basis of the expert's proposed testimony. In an aside, defense counsel asked if he could "slip the expense in the bill"; defense counsel did not refer to Evidence Code section 730 or any other authority for his request. While the testimony of a handwriting expert might have been helpful, defense counsel failed to explain how such testimony was necessary to the defense and instead stressed defendant's desire for the testimony.

The trial court pointed out that defendant could testify and deny that the handwriting on the note was his. Handwriting expert testimony differs markedly from

8

ancillary services found necessary in *Ake*, *supra*, 470 U.S. at p. 77.  In *Ake,* the defendant's mental condition was relevant to his criminal culpability and the punishment he faced.  In addition, jurors, who have no training in psychiatric matters, are not in a position to make a determination of a defendant's mental condition at the time of the crime.  Therefore, the defendant had a constitutional entitlement to a psychiatric expert.  (*Id.* at pp. 80-83.)  Handwriting requires no such specialized expertise.  Under Evidence Code section 1417, the genuineness of handwriting may be proved by a comparison made by the trier of fact.  In other words, a jury is fully capable of comparing handwriting samples and assessing their authorship.  And they were directed to the issue by defendant's own testimony.

In the absence of a showing that the handwriting expert's testimony was necessary, we cannot find the trial court abused its discretion in denying defendant's request to pay expert witness fees.[3]

## Clerical Error

Defendant argues the abstract of judgment should be corrected to properly reflect both his sentence and his actual time spent in custody.  The People concede the issue.

---

[3]  We find *Taylor v. Superior Court* (1985) 168 Cal.App.3d 1217, cited by defendant, distinguishable.  In *Taylor*, the defendant was represented by a community legal services organization counsel and requested the appointment of a fingerprint expert.  The trial court agreed the expert was appropriate but found the county should not be required to furnish funds to a federally funded agency.  Instead, the defendant should apply to the public defender, who could provide an adequate defense.  (*Id.* at pp. 1218-1219.)  The appellate court found an abuse of discretion where "necessary ancillary services are denied to an indigent defendant; the court may not require defendant to accept the public defender as his counsel."  (*Id.* at p. 1220.)  Here, the trial court made no such demand but only declined defense counsel's request to "slip the expense" into the bill.  Nor did the trial court find the handwriting expert's testimony necessary; instead, the court noted defendant could testify about the handwriting on the note.  And defendant did so testify.

The court sentenced defendant to 15 years, 10 years (double the upper term of five years) for second degree robbery plus five years for the prior serious felony conviction. The court gave defendant 764 days of presentence custody credit: 665 actual days plus 99 days of local conduct credits.

The abstract of judgment incorrectly states defendant was sentenced to the upper term of 15 years for second degree robbery and does not indicate he was sentenced to the upper term of five years, doubled pursuant to section 667, subdivision (e)(1). Nor does the abstract reflect that defendant's sentence was enhanced by five years under section 667, subdivision (a). The abstract also incorrectly lists 699 days of actual credit.

We direct that the abstract of judgment be corrected to accurately reflect defendant's sentence and custody credits. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

We direct the trial court to correct the abstract of judgment as indicated and to forward a certified copy thereof to the Department of Corrections and Rehabilitation. In all other respects, we shall affirm the judgment.


                                                             RAYE            , P. J.



We concur:



        NICHOLSON        , J.



        MURRAY          , J.



10